IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MAURICIO RAMOS-GONZALES,<br><br>Defendant. | CR 24-133-BLG-SPW<br><br><br><br>ORDER |

Before the Court is Defendant Mauricio Ramos-Gonzales's Motion to Suppress. (Doc. 25). Ramos-Gonzales is charged with being a prohibited person in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(5)(a). (Doc. 1). Ramos-Gonzales seeks to suppress the evidence obtained from law enforcement's search of his hotel room on April 12, 2024, that resulted in his arrest in September 2024. (Doc. 26 at 17). Ramos-Gonzales argues that the evidence seized must be suppressed because his consent to the warrantless search was not freely and intelligently given, nor was it unequivocal and specific. (*Id.* at 18). The Government responded on January 29, 2025 (Doc. 32), and Ramos-Gonzales replied on February 5, 2025. (Doc. 34). A suppression hearing was held on June 6, 2025, where Billings Police Department ("BPD") Officers Devin Proudfit, Zachary Figg, and Alfredo Campana testified. The Court finds the material facts are not disputed

1

based on the parties' briefing, the officers' reports, body cam videos, and the officers' testimony.

Considering the parties' briefing and the testimony and evidence presented at the hearing, the Court denies Ramos-Gonzales's motion.

## I. Background

On April 12, 2024, at 2:23 a.m., BPD officers were dispatched to the Heights Inn Motel after a caller reported hearing gunshots. (Doc. 27 at 2). BPD Officer Zachary Figg learned through dispatch that the complainant believed the shots came from Room 199. (*Id.*). Officers at the scene found that the first-floor rooms only went to 116 and began investigating the second floor of the motel. (*Id.*). Officers walked up to the second floor of the motel, where they observed multiple shell casings around Room 229. (Doc. 28-D at 7:42–47). BPD officers knocked on the door, and Ramos-Gonzales opened the door; the officers then removed him from the room, detained him, and handcuffed him. (*Id.* at 7:58–8:20).

After Ramos-Gonzales was detained, several officers entered Room 229, located another individual lying on the far bed, and handcuffed the individual. (*Id.* at 9:10–20). Officers continued to look around the room and observed an unspent round of ammunition in between the two beds. (*Id.* at 10:31).

BPD Officer Proudfit then attempted to communicate with Ramos-Gonzales but had difficulty due to Ramos-Gonzales's limited English. (*Id.* at 10:50). Officers

eventually determined that Ramos-Gonzales was telling them that two individuals came up from Room 111, fired gunshots into the apartment, and then took off running. (*Id.* at 11:14–14:32). BPD Officer Proudfit returned to Room 229 and asked Ramos-Gonzales if he could go inside the hotel room; Ramos-Gonzales replied, "Yeah okay, no problem." (*Id.* at 20:32). Officer Proudfit looked around the hotel room for less than a minute and exited after failing to find any markings indicating gunfire on the wall. (*Id.* at 21:24)

Officer Campana, a Spanish speaker, then arrived at the scene, and an officer relayed to him what he had learned. (Doc. 28-E at 3:22–40). Officer Campana went up to Room 229 and spoke with Ramos-Gonzales. (*Id.* at 4:03). Ramos-Gonzales told Officer Campana that he called 911 after two individuals came up to the room and fired gunshots. (Doc. 26-1 at 4).[1] Officer Campana questioned Ramos-Gonzales about the ammunition found in his room. Ramos-Gonzales responded that the officers kicked the round inside his room when they first arrived. (*Id.* at 7). Officer Campana asked Ramos-Gonzales if he had a gun, to which Ramos-Gonzales responded, "No." (*Id.*). Officer Campana asked if officers could check inside his room, to which Ramos-Gonzales replied, "You can check, no problem." (*Id.* at 8).

---

[1] Doc. 26-1 is an English translation of the conversation between Officer Campana and Ramos-Gonzales. The Government has not objected to the contents of the translation, and the Court will assume the transcript is accurate for purposes of evaluating the Motion to Suppress.

3

Shortly after, Officer Campana approached Ramos-Gonzales with a written consent to search form. (Doc. 28-E at 16:47). Officer Campana informed Ramos-Gonzales that the form was for consent to search inside Room 229 and that the purpose was to determine if there was a gun in the room. (Doc. 26-1 at 16). Ramos-Gonzales asked, "What if we don't want to sign, is there a problem?" (*Id.*). In reply Officer Campana asked, "You don't want to sign?" to which Ramos-Gonzales replied, "No." (*Id.*). Office Campana reminded Ramos-Gonzales that when he had asked for permission to search the room earlier, he had agreed and asked if he was now changing his mind. (*Id.* at 17). Ramos-Gonzales responded, "No, no, no, go ahead, there is no problem." (*Id.*). Ramos-Gonzales then signed the consent to search form. (Doc. 28-E at 18:50).

Officer Campana brought Ramos-Gonzales down to the first level of the motel and read him his Miranda rights. (Doc. 27 at 32, 37). As Officer Campana questioned Ramos-Gonzales, BPD officers searched Room 229 and located a Tisas .45 caliber pistol, a Sig Sauer magazine, and assorted ammunition. (*Id.* at 37).

Ramos-Gonzales was later charged with being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A). (Doc. 2).

## II. Legal Standard

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. The Supreme Court has repeatedly affirmed that "the ultimate

touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 373, 381 (2014)). If law enforcement violates a defendant's Fourth Amendment right to be free from unreasonable searches and seizures, then, under the exclusionary rule, "all evidence seized as a result" of the unconstitutional actions of law enforcement "must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

## III. Discussion

From the time police arrived at the hotel until the gun was discovered in Ramos-Gonzales's room, BPD officers entered his room three times without a warrant. The first entry occurred immediately after detaining Ramos-Gonzales outside his hotel room. The second entry occurred approximately five minutes later after Officer Proudfit asked Ramos-Gonzales if he could look inside his room. The final warrantless entry and search occurred after Ramos-Gonzales signed the consent to search form. During the final warrantless search of the hotel room, police discovered a gun and ammunition that formed the basis of his current charges.

Ramos-Gonzales argues that the consent to search Room 229 was not freely and intelligently given, nor was it unequivocal and specific, making the warrantless search of his room illegal under the Fourth Amendment. (Doc. 26 at 18,

5

23). Furthermore, he argues that even if his eventual consent was voluntary, BPD's entry into his hotel room before he signed the consent form tainted any subsequent consent, rendering the search illegal. (Doc. 26 at 23 (quoting *United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir. 1998)) ("Consent to search that is given after an illegal entry is tainted and invalid")).

In response, the Government first contends that the BPD officers' initial entry into the room was a legal protective sweep based on the report of shots being fired at the motel. (Doc. 32 at 7). In addition, the Government argues that Ramos-Gonzales's consent to search Room 229 was voluntarily given, based on the established voluntariness factors and his signature on the consent to search form. (Doc. 32 at 11–14).

This Court will first address whether the first warrantless search of Ramos-Gonzales's room was constitutional as a protective sweep. Then, whether the two subsequent searches of his room were constitutional based on Ramos-Gonzales's consent. If it is determined that any of the searches were unconstitutional, the Court will then decide if the evidence must be suppressed under the exclusionary rule or if the attenuation doctrine applies.

    A.    *Entry 1 – Protective Sweep*

The Government argues that the first entry into the hotel room was a lawful protective sweep incident to Ramos-Gonzales's detention. (Doc. 32 at 7). Ramos-

Gonzales does not dispute that the officers had the authority to enter his hotel room at the beginning of the encounter but argues that the two minutes the police spent inside the room were unnecessary to search for individuals hiding in the room. (Doc. 34 at 8).

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A protective sweep is permitted if the officer "possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. A protective sweep "is not a license to search every nook and cranny of a house but is subject to two significant limitations: it 'extends only to a cursory inspection of those spaces where a person may be found' and lasts 'no longer than it takes to complete the arrest and depart the premises.'" *United States v. Lemus*, 582 F.3d 958, 962 (9th Cir. 2009) (quoting *Buie*, 494 U.S. at 335–36).

The Court finds that the protective sweep was justified by specific and articulable facts known to the police at the scene. The police were responding to a 911 call reporting multiple gunshots fired and had observed bullet casings outside of Room 229. After detaining Ramos-Gonzales, the officers observed another individual lying on the bed. Here, the circumstances were such that BPD officers

possessed a reasonable belief that a serious potentiality for danger existed. *See Buie*, 494 U.S. at 336–37.

Further, the Court finds that the officers conducted the protective sweep in a constitutionally permissible manner. Officers remained within the room for a short period, less than two minutes, and limited their search to areas where a person could be located. Therefore, the first entry into the hotel room was justified as a protective sweep.

### B.    Entry 2 and 3 – Consent to Search

The Fourth Amendment generally prohibits warrantless entry of a person's hotel room, whether to make an arrest or to conduct a search, unless an exception to the warrant requirement, such as consent, emergency, or exigency, applies. *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010); *Hoffa v. United States*, 385 U.S. 293, 301 (1966). The Fourth Amendment's warrant requirement does not apply to an officer's entry into a person's room when voluntary consent has been obtained from the individual whose property is to be searched. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Id.* It is the government's burden to prove that the consent was freely and voluntarily given. *See Bumper v. North Carolina,* 391 U.S. 543, 548, (1968); *United States v. Chan–Jimenez,* 125 F.3d 1324, 1327 (9th Cir. 1997).

The Ninth Circuit has identified five factors to be considered in determining the voluntariness of consent to a search. They are: "(1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that they had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989) (distilling from the case law the five factors now widely used)); *accord United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000) (citing the five factors); *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000) (same); *Chan–Jimenez*, 125 F.3d at 1327 (same). No one factor is determinative in the equation. *Castillo*, 866 F.2d at 1082. It is not necessary to check off all five factors, but "many of [the Ninth Circuit's] decisions upholding consent as voluntary are supported by at least several of the factors." *Chan–Jimenez*, 125 F.3d at 1327 n.3.

In addition to these standard factors, in cases involving a foreign national, such as here, courts should also assess voluntariness by examining: (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of their rights in their native language; (3) whether the defendant appeared to understand those rights; (4) whether the defendant had the assistance of a translator; (5) whether the defendant's rights were explained painstakingly; and (6) whether the defendant

9

had experience with the American criminal justice system. *United States v. Amano*, 229 F.3d 801, 804 (9th Cir. 2000); *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998).

### 1. Entry 2 into Hotel Room

The second warrantless entry and search occurred about five minutes after the protective sweep. While standing outside the hotel room, waiting for Officer Campana to arrive, Officer Proudfit asked Ramos-Gonzales if he could enter the room. Ramos-Gonzales replied, "Yeah, okay, no problem." Officer Proudfit looked inside the room for about a minute for any signs of gunfire and, after finding nothing, exited the room.

After considering the voluntariness factors, the Court finds that Ramos-Gonzales's consent was involuntary. Ramos-Gonzales was in custody throughout the incident and remained in handcuffs when asked for his consent to look inside the room. Officers did not Mirandize Ramos-Gonzales until well after the search was completed, and as the Ninth Circuit has held, "when a *Miranda* warning follows rather than precedes the purported consent, it cannot support the voluntariness of the consent." *United States v. Perez-Lopez*, 348 F.3d 839, 847 (9th Cir. 2003). Additionally, Ramos-Gonzales was never informed that he had the right to refuse consent. Knowledge of the right to refuse consent is "highly relevant" in determining whether consent is valid. *United States v. Mendenhall*, 446 U.S. 544,

558-59; *Feaster v. Las Vegas Metro. Police Dep't*, 451 Fed. Appx. 663, 664 (9th Cir. 2011); *United States v. Fritts*, 5 Fed. Appx. 765, 767 (9th Cir. 2001); *United States v. Bostic*, 83 F.3d 429 (9th Cir. 1996). Further, regarding the foreign national factors, Ramos-Gonzales did not sign a written waiver, he was not advised of his rights in his native language, did not have the assistance of a translator, and did not have his rights explained painstakingly.

The only factors weighing in favor of Ramos-Gonzales's consent being voluntary are that Officer Proudfit did not have his gun drawn when he asked for permission to search his room, and he was not told that a warrant would be obtained if he refused the search.

Here, under the totality of the circumstances, the Court finds that Ramos-Gonzales consent was not voluntarily given. Therefore, the Court finds that the second entry into the room was an improper warrantless search.

    2.    *Entry 3 into Hotel Room – Consent to Search Form*

The third warrantless entry and search occurred after a conversation between Ramos-Gonzales and Officer Campana, a Spanish-speaking officer. Officer Campana arrived shortly after Officer Proudfit searched the hotel room. Officer Campana questioned Ramos-Gonzales about the unspent round of ammunition found in his room during the protective sweep. After Ramos-Gonzales told Officer Campana that the round was kicked in by officers during their initial protective

sweep and denied owning a gun, Officer Campana asked him if he could search the room. Ramos-Gonzales responded affirmatively, and Officer Campana gave Ramos-Gonzales a consent to search form, which he eventually signed. Officers then searched the room and found the gun and ammunition that formed the basis of the current charges.

Much of the analysis regarding the standard voluntariness factors is like the analysis above. Ramos-Gonzales remained in custody during his conversation with Officer Campana, was not Mirandized until after the search, and was not specifically told he had the right to refuse consent. On the other hand, Officer Campana did not have a gun drawn and did not tell Ramos-Gonzales that a search warrant could be obtained if he refused consent.

However, unlike the analysis for the second warrantless entry, the majority of the foreign national factors weigh in favor of voluntary consent. Ramos-Gonzales signed a written waiver and was advised about the waiver in his native language by Officer Campana. Further, Officer Campana explained the purpose of the consent to search form in Spanish, and Ramos-Gonzales appeared to understand what he was agreeing to by signing the form. When Officer Campana first presented the consent to search form, Ramos-Gonzales seemed unsure of its purpose. He asked Officer Campana, "What if we don't want to sign? Is there a problem?" Officer Campana then clarified that the consent to search form was to look inside the hotel room,

which Ramos-Gonzales had previously agreed to. Ramos-Gonzales then told Officer Campana to "go ahead, there is no problem." At this point, Ramos-Gonzales understood that he was permitting the officers to search his hotel room for evidence related to the investigation.

Although Officer Campana explained what the consent to search form was, he failed to explain Ramos-Gonzales's rights painstakingly. Most problematic was Officer Campana's failure to inform Ramos-Gonzales that he had the right to refuse consent, language that comes directly from the consent to search form.

This search presents a close call for the Court, as there are multiple factors for and against finding Ramos-Gonzales's consent to be voluntary. However, the Court finds that the key factor here is Officer Campana's explanation regarding the nature and the scope of the search in Ramos-Gonzales's native language. Based on Officer Campana's explanation, Ramos-Gonzales understood what he was consenting to and freely signed the consent to search form. Therefore, the Court finds that Ramos-Gonzales's consent was voluntarily given when he signed the consent to search form.

    C.    *Attenuation Doctrine*

Ramos-Gonzales argues that any evidence seized following his signing of the consent to search form should be suppressed due to the illegal entry that occurred before his consent. (Doc. 26 at 23). As this Court has determined that the second entry into the hotel room was unconstitutional, it is necessary to determine if the

"taint" of the illegal search invalidates the subsequent constitutional search based on Ramos-Gonzales's consent.

A valid consent to search that is given after an illegal entry is tainted and invalid under the Fourth Amendment. *Hotal*, 143 F.3d at 1228; *United States v. Suarez*, 902 F.2d 1466, 1468 (9th Cir. 1999). An illegal entry into a residence generally invalidates a subsequent consent search. *United States v. Howard*, 828 F.2d 552 (9th Cir. 1987). The test for determining whether the primary taint of a prior constitutional violation has been purged is commonly referred to as an "attenuation analysis." *United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004). To determine whether a prior illegality is sufficiently connected to the subsequent consent, courts look to three factors: (1) the "temporal proximity" between the unconstitutional conduct and the discovery of evidence between illegality and consent; (2) "the presence of intervening circumstances;" and (3) particularly significant, "the purpose and flagrancy of the official misconduct." *Utah v. Strieff*, 579 U.S. 232, 239 (2016).

   *1.   Temporal Proximity*

"The lack of a significant intervening period of time does not, in itself require that the evidence be suppressed for want of sufficient attenuation." *United States v. Wellins*, 654 F.2d 550, 555 (9th Cir. 1981). However, it does "bear ... directly on

the probability of taint." *Washington*, 387 F.3d at 1073 (quoting *United States v. Delgadillo-Velazquez*, 856 F.2d 1292, 1300 (9th Cir. 1988)).

Here, the temporal proximity between the violation of Ramos-Gonzales's Fourth Amendment rights and his valid written consent weighs in favor of suppressing the evidence. At most, twenty minutes passed between the illegal entry and search of the hotel room and the valid consent to search. Such a brief period between the illegal entry and the valid search is insufficient to purge the taint of the unconstitutional conduct. *See Brown v. Illinois*, 422 U.S. 590 (1975) (two hours was insufficient to remove taint of illegal conduct); *United States v. Perez-Esparza*, 609 F.2d 1284 (9th Cir. 1979) (three hours was insufficient to remove taint of illegal conduct); *United States v. George*, 883 F.2d 1407, 1416 (9th Cir. 1989); ( "no court has weighed the first factor against a defendant when his inculpatory statement followed illegal police conduct by only a few hours.")

### 2. Intervening Circumstances

In determining whether intervening circumstances may have purged the taint of its illegality, the Court looks at the intervening events of significance rather than the defendant's conduct. *Washington*, 387 F.3d at 1073. Intervening circumstances that favor the application of the attenuation doctrine must be sufficiently important to guarantee that the tainted evidence was discovered through some process other than the exploitation of an illegal search. *Id.* (citing *Wong Sun*, 371 U.S. at 487–

88). Examples of such intervening circumstances include the release from custody, an appearance before a magistrate, or a consultation with an attorney. *George*, 883 F.2d at 1416; *Delgadillo-Velasquez*, 856 F.2d at 1300. A defendant signing a consent to search form following an illegal search is "distinct from examples of 'intervening circumstances' that have been considered sufficient to purge the taint of prior constitutional violations." *Washington*, 387 F.3d at 1074. According to the Ninth Circuit, the act of signing a consent to search form "does not have a tendency to distance the suspect from the coercive effects of temporally proximate constitutional violations." *Id.*

Here, because the only intervening circumstance was Ramos-Gonzales's signing of the consent to search form, this factor weighs in favor of suppressing the evidence.

### 3. *Purpose and Flagrancy of the Official Misconduct*

The exclusionary rule exists to discourage police misconduct. The third factor of the attenuation doctrine, the purpose and flagrancy of the police misconduct, is "particularly important" because it comes the closest to satisfying "the deterrence rationale for application of the exclusionary rule." *Perez-Esparza*, 60 F.2d at 1289.

Here, the conduct of the police strongly weighs against the suppression of the evidence. When Officer Proudfit asked Ramos-Gonzales if he could look into his hotel room, and he consented, Officer Proudfit was under the good-faith impression

that he could search the room under the well-established consent exception to warrantless searches. Officer Proudfit did not coerce Ramos-Gonzales when he asked for his permission to enter the room. Instead, he asked once if he could look inside the room, and Ramos-Gonzales quickly consented. Further, Officer Proudfit searched the room for less than a minute, looking for markings on the wall that would indicate a firearm had been shot inside the room or into the room, and after seeing no such markings, he quickly exited. In sum, Officer Proudfit made a mistake based on Ramos-Gonzales's consent to enter the room, only entered the room for a short period, and limited his search to the walls of the hotel room. No relevant evidence was seized or observed.

The purpose and flagrancy factor is of significant importance in the attenuation analysis, and here, this factor weighs strongly in favor of the Government. The Court finds that this factor outweighs the other two factors and that suppression is unwarranted, based on Officer Proudfit's entry into Ramos-Gonzales's room before the consent to search form was signed.

## IV. Conclusion

For these reasons, the Court finds that law enforcement did not violate Ramos-Gonzales's Fourth Amendment rights when they searched his hotel room and

discovered the evidence that formed the basis of his current charges. All of the evidence obtained as a result of the search is admissible.

IT IS HEREBY ORDERED that Defendant Mauricio Ramos-Gonzales's Motion to Suppress (Doc. 25) is DENIED.

DATED this 17th day of June, 2025.

SUSAN P. WATTERS
United States District Judge